***********
Upon review of all of the competent evidence of record with reference to the errors assigned, and finding no good grounds to reconsider the evidence, receive further evidence, rehear the parties or their representatives, the Full Commission MODIFIES and AFFIRMS the Opinion and Award the Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The parties are subject to, and bound by the provisions of the North Carolina Workers' Compensation Act.
2. GRIT/Zenith Insurance Company is the insurance carrier for defendant-employer.
3. Plaintiff sustained an injury by accident to her right shoulder while lifting a crate of food on July 9, 1998.
4. Pursuant to a Form 63, defendants paid compensation to plaintiff without contesting the claim within the statutory period allowed under N.C. Gen. Stat. § 97-18(d).
5. Defendants applied to terminate plaintiff's ongoing total disability benefits on May 9, 2000. The Industrial Commission approved defendants' application on June 14, 2000.
6. Judicial notice is taken of all Industrial Commission forms contained in the file.
7. At the hearing before the Deputy Commissioner, the parties stipulated to the following exhibits, which were entered into evidence:
a. Stipulated Exhibit 1 — Pretrial Agreement
b. Stipulated Exhibit 2 — plaintiff's medical records
8. The issues for determination are as follows:
 a. Whether plaintiff is entitled to reinstatement of her temporary total disability benefits;
b. Whether plaintiff is entitled to payment of back wages;
 c. Whether plaintiff is entitled to change her authorized treating physician;
d. What is plaintiff's average weekly wage?
 e. What, if any, permanent partial disability benefits is plaintiff entitled to receive as a result of her injury by accident on July 9, 1998.
 ***********
Based upon all of the competent evidence of record the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was thirty-nine (39) years of age, with her date of birth being December 5, 1962. Plaintiff graduated from high school, and received no other specialized education, other than on-the-job training.
2. Plaintiff was employed by defendants as an assistant food service worker, and as of July 9, 1998, she had worked in that capacity for over ten (10) years. As a food service worker, plaintiff prepared food for the Brunswick County jail and other users of the Brunswick County Government complex. Plaintiff's duties required her to prepare food, to clean, and to lift pots, pans, and cases of food.
3. On July 9, 1998, plaintiff's average weekly wage was $349.40, yielding a compensation rate of $232.94. On that date, plaintiff sustained an admittedly compensable injury by accident to her right shoulder while lifting cases of food when she experienced a popping, pulling sensation in her right shoulder.
4. Defendants accepted the compensability of that injury by filing a Form 63 on July 22, 1998, and began paying plaintiff ongoing total disability compensation. Defendants stipulated in the Pretrial Agreement, Stipulated Exhibit 1, that they did not contest the compensability of the claim within the statutory period.
5. Following her admittedly compensable injury on July 9, 1998, plaintiff was initially treated at Doctor's Urgent Care, where the results of her x-rays were normal, and she was diagnosed as having sustained a cervical sprain. Plaintiff was restricted to sedentary work, to lifting no more than ten (10) pounds, to limited walking, and alternating between sitting and standing.
6. Plaintiff consulted Dr. Landon B. Anderson, an orthopaedic surgeon, on July 16, 1998. Following his initial examination, Dr. Anderson was unable to definitively diagnose plaintiff's condition and noted that her symptoms could be the result of a right arm strain or a cervical disc problem. Dr. Anderson removed plaintiff from work and prescribed medications and physical therapy. Plaintiff continued under the care of Dr. Anderson and was not released to return to work through December 22, 1998, when her care was transferred to Dr. Adam Brown. Dr. Anderson noted on multiple occasions that plaintiff's symptoms did not match the objective medical findings.
7. Prior to the transfer of her care, plaintiff was examined on November 6, 1998 by Dr. Anna P. Bettendorf, a physiatrist. An EMG/nerve conduction study ordered by Dr. Bettendorf suggested an injury older than three months to the lower trunk brachial plexus. There was no evidence of cervical radiculopathy.
8. Plaintiff was first examined by Dr. Adam P. Brown, a neurosurgeon, on December 22, 1998. Following his examination, Dr. Brown noted that although plaintiff's history suggested that she might have some type of sympathetic pain syndrome, his examination revealed no physical evidence of that type of ailment. Dr. Brown continued to write plaintiff out of work, recommended pain management and trigger point injections. Dr. Brown concluded that he had nothing to offer plaintiff from a surgical standpoint, and referred her to Dr. Thomas M. Dalton, an anesthesiologist, at the Center for Pain Management.
9. Plaintiff was initially examined by Dr. Dalton on January 14, 1999, at which time he noted that she had sustained a brachial plexus injury. Upon examination, Dr. Dalton felt that plaintiff was experiencing early signs of reflex sympathetic dystrophy, hereinafter RSD. As for her prognosis, at that time Dr. Dalton testified that plaintiff would be unable to work for at least six months. Dr. Dalton anticipated that plaintiff would experience some degree of discomfort secondary to her brachial plexus disruption for several years, and possibly on a permanent basis.
10. Under Dr. Dalton's care, plaintiff underwent a series of trigger point injections along the right spinous musculature including the trapezius muscle. Plaintiff also had several interscalene nerve blocks as well as right-sided stellate ganglion blocks. Following this course of treatment, on April 8, 1999, plaintiff returned to Dr. Dalton who noted that she reported severe pain for which he could find no definitive cause. At that time, Dr. Dalton recommended that plaintiff consult a rehabilitation physician and consider the possibility of placing a spinal cord stimulator to help treat her pain symptoms. Dr. Dalton restated that plaintiff was unable to return to work.
11. In July 1999, Dr. Dalton referred plaintiff to Dr. Barrie Hurwitz, a neurologist at Duke Medical Center for a second opinion. Dr. Hurwitz initially examined plaintiff on July 27, 1999. Dr. Hurwitz noted that plaintiff was developing a mild, partial frozen shoulder and recommended aggressive physical therapy. From his examination, which took place approximately one year after plaintiff's injury by accident, Dr. Hurwitz' did not observe signs of longstanding RSD. Following additional tests, Dr. Hurwitz found no objective evidence to support a diagnosis of RSD. Dr. Hurwitz recommended plaintiff begin rehabilitation and a work hardening program.
12. Defendants placed plaintiff under the care of Dr. Alan Tamadon, a physiatrist, on October 5, 1999. Dr. Tamadon replaced Dr. Brown and Dr. Dalton as plaintiff's primary treating physician. Subsequent to his examination, Dr. Tamadon excluded a frozen shoulder as a diagnosis, and did not feel plaintiff had sustained a brachial plexus injury. As of October 21, 1999, Dr. Tamadon encouraged plaintiff to return to her regular activities and predicted plaintiff would reach maximum medical improvement once she tapered off and discontinued her prescription medications. Dr. Tamadon's findings and recommendations were forwarded to Dr. Dalton.
13. On October 28, 1999, plaintiff returned to Dr. Dalton, who recommended a series of epidural steroid injections followed by the trial use of a spinal cord stimulator. During his deposition, Dr. Dalton was asked about this recommendation in light of the findings and recommendations of Dr. Tamadon. In response, Dr. Dalton acknowledged the difficulty of obtaining a definitive diagnosis in these types of cases, where pain is the primary or only symptom. However, Dr. Dalton did not abandon his diagnosis of RSD, which he definitively diagnosed in August 2000, and noted that the use of a spinal cord stimulator is appropriate for any stage of that condition. Dr. Dalton testified that the use of a spinal cord stimulator provided plaintiff the best chance of obtaining relief from her symptoms. As of September 22, 2000, Dr. Dalton concluded plaintiff was permanently disabled.
14. On December 22, 1999, Dr. Hurwitz assigned plaintiff a ten percent (10%) permanent partial disability rating to her arm based on her pain, but also indicated that she would be unable to perform any type of gainful employment until her pain was controlled.
15. On February 8, 2000, Dr. Tamadon diagnosed plaintiff as having right shoulder pain, felt she had reached maximum medical improvement, and had no permanent partial disability. On February 8, 2000, Dr. Tamadon fully released plaintiff to return to work with no restrictions.
16. On June 14, 2000, the Commission approved defendants' Form 24 Request to Terminate Payment of Compensation effective as of May 11, 2000. In the Order, it was noted that defendants submitted documentation in support of the contention that plaintiff had been released by her authorized physician to return to regular duty work without restrictions. The referenced documents are the records of February 8, 2000 from Dr. Tamadon. Thereafter, defendants terminated plaintiff's compensation and contend that there was an overpayment of benefits.
17. In a letter dated September 22, 2000 Dr. Dalton described plaintiff's condition as follows:
 "[Plaintiff] has a long history of right arm pain consistent with brachial plexus injury followed by the onset of sympathetically mediated pain syndrome. The pain has completely disrupted her life and lifestyle and will be a permanent disability. I believe that much of this could have been avoided if we had followed through with our initial plan of October 1999 when I wanted to do a series of cervical epidural steroid injections followed by placement of a spinal cord stimulator. This was early in regard to the progression of her pain syndrome that has taken a progressive[ly] deteriorating course."
18. Drs. Brown and Dalton found plaintiff's complaints of pain were credible and that based upon her chronic pain syndrome, plaintiff was unable to work in any employment. The Commission gives greater weight to the opinions of Drs. Dalton and Brown than to those of Dr. Tamadon. Therefore, the Full Commission finds plaintiff's complaints of chronic pain to be credible.
19. Because of the conflicting medical opinions concerning ongoing treatment and the possibility of the spinal cord stimulator, plaintiff would benefit from an independent medical evaluation and further consideration of implantation of the spinal cord stimulator.
20. As the result of the compensable injury by accident and resulting chronic pain, plaintiff was disabled from any employment. Therefore, the Form 24 application was improvidently approved and plaintiff's compensation should not have been terminated as of May 11, 2000.
 ***********
Based upon the foregoing findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. As the result of her July 9, 1998 injury by accident, plaintiff is entitled to have defendants resume payment of ongoing total disability compensation at the rate of $232.94 per week beginning May 11, 2000 and continuing until such time as she returns to work or further Order of the Commission. N.C. Gen. Stat. §§ 97-18; 97-29.
2. Defendants are entitled to a credit for any portion of the ongoing total disability compensation benefits which has already been paid. N.C. Gen. Stat. § 97-42.
3. As the result of her July 9, 1998 injury by accident, plaintiff is entitled to have defendants pay for all related medical expenses incurred or to be incurred. The approved medical expenses shall include the use of a spinal cord stimulator if said procedure is recommended by the independent medical evaluation physician, as ordered below. N.C. Gen. Stat. §§ 97-25; 97-25.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendants shall pay to plaintiff ongoing total disability compensation at the rate of $232.94 per week for the period of May 11, 2000 through the present and continuing until such time as she returns to work or further Order of the Commission. From the accrued portions, this compensation shall be paid to plaintiff in a lump sum. This compensation is subject to the credit in defendants' favor for any portion of these benefits which has already been paid and to the attorney's fee approved below.
2. Defendants shall pay for all related medical expenses incurred, or to be incurred, as the result of plaintiff's July 9, 1998 injury by accident. The approved medical treatment includes the independent medical evaluation ordered below, as well as the spinal cord stimulator if recommended by the independent medical evaluator. Additionally, Dr. Dalton is hereby approved and designated as plaintiff's primary treating physician.
3. A reasonable attorney's fee of twenty-five percent (25%) of the compensation awarded herein is approved for plaintiff's counsel. From the compensation having accrued, this fee shall be deducted from the amounts due plaintiff and paid directly to counsel for plaintiff, with counsel for plaintiff receiving every fourth check thereafter.
4. The Full Commission assigns this case to Margaret G. Dunn, R.N.C.D.M.S., C.C.M., director of the medical rehabilitation nurses section of the Industrial Commission, for ongoing management of plaintiff's medical treatment.
5. The parties shall confer and agree on a physician to perform an independent medical evaluation in order to ascertain plaintiff's current medical condition and whether a spinal cord stimulator is recommended. If the parties are unable to agree, Ms. Dunn shall select an appropriate physician. The independent medical evaluation shall be at a reasonable time and place, given plaintiff's location and physical restrictions.
6. Defendants shall pay the costs.
This the ___ day of April 2003.
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER